Good morning. May it please the Court. My name is Rebecca Smith, seated at Council Table as Tim Beck told, and we represent the appellant, the Alliance for the Wild Rockies. I would like to request five minutes to reserve for rebuttal. This is a case about the helicopter hazing of buffalo off of a national forest and into a national park to make room on the national forest so that private ranchers can graze privately owned cattle. Now it is completely legal for the agencies to use helicopters to harass and displace the buffalo off of those lands, just as it would be completely legal for them to use helicopters to displace elk, moose, and a number of other wildlife species that inhabit the area. But it is not legal for them to harass and displace Yellowstone grizzly bears, because Yellowstone grizzly bears are protected under the Endangered Species Act, and under the Endangered Species Act, in order to displace grizzly bears, you first need an incidental take statement or permit. And so that Displace them? I thought that the incidental take statement requirement is a little more than that, as to what the harm has to be. Your Honor, the term take is covered in incidental take statements or permits. The term take is defined to include harm, harass, pursue, hunt, shoot, wound, kill, trap, capture, collect, or an attempt to do any one of those things. Tax place. Well, the term harass does include that term. The term, the distinction, an important distinction to make in this case, is that the terms harm and harass are both forms of take, but they are very different definitions. The term harm requires actual injury or death and a significant impairment, but the term harass only requires a likelihood of injury, and that injury is in the form of disruption. And if we look back in 1981, the Fish and Wildlife Service redefined the term harm, and they took the word disrupt out of the harm definition and put in the word impair. And they expressly stated the reason they put in that word impair instead of disrupt was to make sure that harm did not apply when a species was disturbed on a temporary basis with no consequent injury. So that was their interpretation of what disrupt actually means, but they left that term disrupt in the definition of harass. And this is a case about harassment, not harm, and that's an important distinction to make, is that all we need to show in this case is that these bears are being disrupted on a temporary basis. And so every time in briefing when the agencies have essentially admitted that there is at least a temporary disturbance when helicopters fly over grizzly bears, well, essentially under these definitions, that is an admission of harassment under the Endangered Species Act. Where did the district court go wrong in several rulings? Well, Your Honor, regarding the take issue, first the district court interpreted all of the facts in the light most favorable to the agencies and didn't actually apply the facts in the studies cited by Alliance to this take issue. Additionally, the district court did make that same mistake that I just discussed, which is that the district court essentially believed that a temporary disturbance did not constitute harassment. But as a matter of law, it does constitute harassment, and that is why this court can grant summary judgment to the Alliance on appeal, because as a matter of law, a temporary disturbance is harassment under the Endangered Species Act, and harassment is a take. And there is no incidental take statement or incidental take permit in this case, and that is the relief essentially that the Alliance is requesting here, is a remand back to the agencies to do a supplemental EIS, but in tandem with that, there would be a biological opinion and an incidental take statement that would set out legally enforceable protective measures when these operations are occurring, and then would essentially to back up a minute, my understanding is that there was a reconsultation with regard to the need for a new bio-op, and some document was produced. Now, are you challenging that? No, Your Honor. Not here you're not, but you're challenging it elsewhere. Your Honor, we are holding off on any challenge to that additional analysis, because we believe that this court can still grant relief that would moot basically that original analysis. The relief that we're requesting in this case is a biological opinion with an incidental take statement as part of a supplemental EIS process. So if this court remands and orders that an incidental take statement be prepared, then the agencies would essentially be redoing that 2012 consultation analysis. I thought an incidental take statement was different. An incidental take statement is issued under ESA Section 7 in tandem with a biological opinion, and so in this case when they did their consultation, they didn't actually provide an incidental take statement and biological opinion. They came to a conclusion that there was no adverse effect, and the Fish and Wildlife Service concurred, so they never took that next step and prepared a biological opinion. An incidental take statement is under Section 7, not Section 9? Yes, Your Honor. The Section 9 is where the take prohibition is that says any person, every person, is prohibited from take. And then Section 10 allows the agency, the Fish and Wildlife Service, to grant incidental take permits essentially to nonfederal actors, but ESA Section 7 has the incidental take statement, because that is supposed to be granted to federal agencies as part of a Section 7 consultation. There is a biological opinion under Section 7 and an incidental take statement under Section 7. So if we conclude that there's a take, or if the district court were to conclude that there's a take, then these other steps take place? Yes, Your Honor. That would happen? Yes, and so it wouldn't actually foreclose the possibility that they could conduct helicopter hazing. It would just require this initial additional analysis document where they set forth mitigation measures in a form that is legally enforceable. So even accepting your definitions of take, of harassment, I thought the government's position was that there was simply no, as a factual matter, it failed to make any showing of a take. Well, Your Honor, the only actual document in the record from the agency that addresses this is a one-page letter from an agency employee, and he actually uses the definition from harm, and he says this activity does not constitute significant impairment or injury or death. So even in that one-page letter, they didn't actually apply the definition of harass. They applied the definition of harm. And then there's a bunch of other material in the summary judgment record. Now, is that because a you're now saying it's Section 7, not Section 9. Ordinarily, you would be reviewing this on an administrative record, but the take issue is not done on an administrative record. It's done on a full summary judgment record in the district court. Is that right? It can be, Your Honor, and because we were arguing that there needed to be a supplemental EIS and a supplemental ESA consultation, there also is really no administrative record for that because that analysis has not actually taken place yet. And so in a reinitiation of ESA consultation claim, just like a supplemental EIS and just like a Section 9 claim, we presented all of the evidence to the district court. So is your current position with regard to the Section 9 issue that you're entitled to summary judgment on that or that there was certain to have been summary judgment and that there needs to be an actual trial and whether there was a take? Well, Your Honor, we believe that as a matter of law, because harass includes temporary disturbance and because every scientific study in the record indicates that grizzly bears flee from helicopters, that as a matter of law ‑‑ I thought they have to have disruption in a life function, like feeding or reproduction or something, not just disruption. The fact that they're running isn't the answer, right? Well, so there's a distinction again between the definition of harm and harass. And harm requires actual impairment, significant impairment of feeding, breeding, or sheltering. Harass only requires a likelihood of injury and that injury is disruption and the definition of disruption is disturbance, even if it's a temporary disturbance. Even if they're running, that's good enough? Yes. Even if they're running and eating everything and reproducing and doing everything else fine? Well, it's a disruption. Running from the helicopters? Yes, it's a disruption from normal behavioral activities, including but not limited to feeding, breeding, or sheltering. So, again, that's more broad than the definition of harm. Ultimately, is your position that if they're running from where they would be to somewhere else, then they're being harassed? Yes, Your Honor. No matter what else is the case? Yes, Your Honor. If they are being even temporarily disturbed under the definition of harass under the ESA, that constitutes harassment. And so that wouldn't necessarily foreclose them from conducting helicopter hazing. All that we're saying is that they have to, you know, promulgate an incidental take statement that says grizzly bears are being harassed by this activity. Maybe they would say, we don't believe this is going to jeopardize the population, but here are some conservation measures that we'll take to ensure that it doesn't do that. And so they've just never done this analysis. It doesn't ultimately mean that they won't be able to engage in this activity. It just means that they need to create this incidental take statement. All of the claims that you brought in the district court relate to protection of the grizzlies? Yes, Your Honor. And you're not attacking the hazing of bison? No, Your Honor. And if I could, I would like to reserve my remaining time. Yes, Your Honor. Thank you. Good morning. May it please the Court, my name is Tekla Hanson-Young, and I represent the federal defendants. With me at counsel's table is Mr. Robert Stutz for the state of Montana. I would like to reserve five minutes of my time, or will try to, for him to speak. I would like to address some of the points made by the alliance in a moment, but the first point I would like the Court to keep in mind when looking at this case is that the IBMP is a very complex, multi-agency, federal-state cooperative agreement that coordinates the various authorities of the different federal and state agencies to help the agencies manage a free-roaming, wild population of Yellowstone bison, both in the park and outside of the park. And the IBMP doesn't impart any authority from one agency or the federal government to another, and the last two pages of the federal government's record of decision make this very clear. The IBMP does not authorize the state to do anything in particular. Now, pursuant to the IBMP, the free-ranging population of Yellowstone bison is maintained by allowing the bison to roam out of Yellowstone during the wintertime when food is scarce in Yellowstone into the state of Montana. The reason why that is acceptable to the state is because bison are kept separate from cattle. It's the – you say somewhere in your briefs that the National Park Service has nothing to say about helicopters flying over the national parks. Is that true? What – the Park Service has no control over the state's use of helicopters. The Park Service cannot, at least to this date, it hasn't issued any regulations that would allow it to do this. Well, it hasn't because we have this plan, but you mean to say that the Park Service has – if it were true that – suppose there wasn't such a plan and they were just flying helicopters and really interfering with grizzly bears, that the Park Service wouldn't have authority to do something about that? Well, that would be a different case, and there would be – That's what a hypothetical is. Go ahead. What would happen in that situation would be if the Park Service tried – you have to imagine what would happen. So say the Park Service tried to ban Montana from flying a helicopter over Yellowstone. Montana would sue the Park Service, and I would be here before you trying to explain the authority that the Park Service had. But that's my point. So therefore, or recognizing at least that possibility, there is a mutual plan about how this is all going to work. Well, no, the Park Service doesn't – the Park Service has explicitly said that it does not have the ability to control Montana's use of helicopters over Yellowstone. While it might have some general statutory authority, say, under the Organic Act or something like that, it hasn't exercised that statutory authority to make any regulations that it could point to that would specifically say – But it has entered into a plan with a set of understandings about how this is going to happen. Well, under the plan, the plan just coordinates the different authorities of the federal and the state agencies. But you just tell me they don't have any authority, so why are they in the plan? Well, it coordinates each agency's individual authority, but it doesn't authorize the state of Montana to do anything. And the Park Service has said that it doesn't have the authority to control the state. Now, with that in mind, that's not to say that if the state of Montana was flying over and the Fish and Wildlife Service determined that the helicopters were actually taking grizzlies, that the federal government would be powerless. The Fish and Wildlife Service could bring a enforcement action against the state of Montana. Because your ultimate position is that although you wrote the EIS and although you entered into the BiOp and although you did the reconsultation, you didn't have to do any of it. No, that is not the government's position. The government clearly has – there is clearly federal action here. The question is just what is the federal action. And the way that Alliance has pled this claim is that the IBMP authorizes the state's use of helicopters. That is not the case. That is the narrow position that the government is taking here. That's not to say that the government would never have to look at cumulative effects of its own actions, which could include the state's use of helicopters. It's simply to say that the states do not control Montana's use of helicopters. Now you referenced what might constitute harassment here. Alliance's definition of harassment, that mere displacement is as a matter of law as harassment, is completely lacking in both the statute and the facts on the ground. If mere displacement was harassment, every single time a camper walked through Yellowstone with bells on it and a grizzly bear ran away, that would be take. It just cannot be the case that a bear running is harassment. If you look at the definition, which is at 50 CFR 17.3, harassment means that an individual member of the species, there's a likelihood of harm to that member because the bear in this case would be annoyed to such an extent as to significantly disrupt its normal behavior patterns. Alliance has presented zero evidence of that happening here. The best evidence they presented is the video, which they submitted to the district court. They didn't submit this to the agencies outside of the district court, so the agencies had no opportunity to look at this outside of the context of this litigation. And what the video shows, and I encourage the court to look at the video, which is available on YouTube, and the site is analyzed as brief. The video shows a fuzzy brown animal running near bison, and there's a helicopter over the bison, and the animal runs maybe at most a couple hundred yards. And if you look at the declaration of Dr. Servine, which is in the record at SER 637, he explicitly goes through both the definition of harm and harassment, and on 637 he says, you know, flight is a normal response to stimulus. It cannot constitute harassment, and that there's no indication the animal would suffer a significant impairment of breeding, feeding, or sheltering, which is the definition of harassment under the ESA. There's zero evidence the district court got that correct. And if there was evidence of take, the appropriate thing for Alliance to do would be to submit it to the Fish and Wildlife Service and allow the Fish and Wildlife Service to bring an enforcement action under Section 9 against the state. But Alliance did not do that here. Where does it say they have to do that? Well, there's a, before Alliance can bring ESA claims against the federal governments or an alleged violator, it has to give a 60-day notice of its intent to sue, which it did. They did here. Well, they gave the 60-day notice, but they did not wait before they filed the lawsuit. Well, they didn't raise the claims. They didn't raise an ESA claim in the first complaint. The government's position, well, there's two things. First of all, the first notice didn't include APHIS or the Fish and Wildlife Service. They seem to have dropped out. That's correct. The government's position is that the original complaint effectually pled and asked relief for, against the federal defendants and the state of Montana under the ESA. And that's reflected in the fact. Well, they didn't. I mean, there were two causes of action and that wasn't one of them. Well, the introduction of the complaint actually specifically asks for relief under the ESA citizen suit provision. And it's also underscored by the fact that Alliance sought a TRO about five days after it filed its complaint alleging ESA harms. But that was brought under NEPA. I'm sorry, what? It was brought under NEPA. And NFMA, that's correct. NFMA. Normally, there were only two counts, and those were NEPA and NFMA. But the NEPA claim... So you're not suggesting that just because there was an endangered species in play here that they couldn't seek injunctive relief until the 60 days had elapsed? Well, the appropriate thing for Alliance... That's not your argument, is it? No, that's not what we're arguing. We're arguing the injunctive relief underscores the fact that really what Alliance was doing was using artful pleading to try to bring a lawsuit quicker so that it could get the injunctive relief. Well, you'd reckon they do have a separate right to maintain a NEPA and NFMA claim, right? Yes, that's absolutely correct. So why shouldn't they be able to do that? It's a very strange... I mean, I'm sort of surprised, actually, that the government has taken this position. Because they have causes of action, and they're entitled to go to court,  That's certainly correct. which requires an exhaustion, but they're not trying to proceed on that. Well, and that's certainly correct. And the federal government has said in its brief that it's not that there's no circumstances under which a plaintiff could bring a NEPA claim, give a 60-day notice... Their NEPA claim mentions as part of it that this is an endangered species, and therefore the NEPA... But they're not claiming a cause of action in that regard under the Endangered Species Act at that point. Well, the important thing for the court to look at is that the first complaint did ask for relief under the ESA citizen supervision. I mean, I gather if they did, they forgot to take it out is what happened. I mean, it was a mistake. Admittedly, this is a close question, and that's why the federal defendants in our brief said that there may be situations where this is okay. We think it falls on the wrong side of the line here. It shouldn't be allowed. It should have been silent. They never should have mentioned protected grizzlies. Well, not even necessarily that, but it shouldn't have been so... What difference does it make? The important thing is that the cause of action, the harm that they were trying to vindicate, did not rest on the ESA. The purpose of the 60-day notice requirement is to give the parties the time to work these things out before litigation is filed. The reality... We can have done that once the complaint was filed? The reality is once the complaint was filed... No, I mean, isn't it... It is possible, isn't it, even though a complaint has been filed, to sit down and talk and, you know, resolve the dispute? It's possible, but the reality is litigation has a chilling effect. And what happened in this complaint was the plaintiff said, we are going to sue you in 60 days and amend our complaint. We're bringing these ESA claims to you. You already knew that because they filed a complaint with you. Well, in the notice, the notice is supposed to say this is a defect and we need to talk about this. And if they add in the letter and if you don't do something, we're going to sue you in 60 days, that's a problem? That's not necessarily a problem. The problem is that the litigation was already ongoing. But, again, this is a close question, and the Court's decision doesn't hinge on this. What's more important for the Court to look at here, if I may, just touch on the Section 7. Just to sort of complete the Section 9, there's no evidence of take here. With respect to Section 7, that alliance's claim is moot. The federal agencies have already reinitiated and completed consultation. Alliance had an opportunity to amend its complaint. It did not. And while alliance has filed a notice of intent to sue for the new biological, it hasn't brought a complaint or hasn't sought to amend its complaint. The best course is for this Court to affirm the district court's judgment, and if alliance has a problem with the new consultation, allow it to bring a new claim. Can I ask whether the representations that were made about the connection between the Section 9 issues and the Section 7 issues and the NEPA issues are correct? They were not made as such in the briefs, I don't think, so I'm curious about that. Yes, I did want to address that. I'm glad you brought that up. What alliance represented is not the federal government's position on the relationship between ESA Section 7 and Section 9. Section 7 applies only to federal agencies, and it imposes on them an obligation to ensure that federal actions don't, and I'm abbreviating here, so please take what I say with a grain of salt, but it imposes an obligation on federal agencies to look at their federal actions and make sure that they're consistent with the ESA, consistent with protecting endangered species. Section 9, it provides independent authority to the Fish and Wildlife Service and applies to not only federal actors but also the state and other private parties and prohibits take of endangered or threatened species. If this Court were to remand here, for example, on this, well, Section 7 and Section 9 are two different things. If this Court were to find take here, for example, it wouldn't necessarily result in a biological opinion being written and an incidental take statement. That would be, if the Court were to find take. Well, would the reason for that be your position that the federal government has nothing to do with this? Is that the only issue? No, that's not necessarily the only issue, but Section 7, a finding of take on behalf of the state doesn't necessarily trigger a requirement that the federal government reinitiate consultation under Section 7. That's not to say that the federal government here wouldn't actually look at the issue and try to figure out what it could do to make sure that its hazing activities or its actions under Section 8 didn't harm grizzlies, and it's clear from the record that that is what the government is doing. It is taking its obligation to protect bison and grizzlies very seriously. Let me ask you this about the evidence. This helicopter hazing is intended to move these bovine creatures from one place to another. That's correct. Now, we have grizzly bears who are not bovine and who are very different, and the argument is with all there is is a video that shows that one grizzly is upset by this. Not even upset. Well, you know, there's one grizzly. Please look at the video, yes. To the extent that your argument hinges on the fact that there's only one, I have a little problem because this is an endangered species. So, you know, it would seem logically that if this conduct that is intended to move these fairly relatively docile creatures, it's going to have a pretty strong effect on grizzly bears. And I don't quite understand why we should say, well, because there's only one that... Well, the video evidence is relevant to the Section 9 take claim. Right. So that establishes take. But whether or not the agencies need to consult, reinitiate consultation with the Fish and Wildlife Service on their role in the hazing operations or on the state's use of helicopters, that's a separate action under Section 7. And the video might have some bearing on that, certainly. If, for example, you had a video that showed a bear, a helicopter chasing a bear, and the bear died in the video, that would clearly have some bearing on the Section 7 claim. So it's not to say that you can't use the video to look at both issues, but whether there's an incident of take is a separate issue under Section 9 and whether the federal agencies need to reinitiate consultation. If the district were to find a take had occurred, what relief could it order? Well, it would have to look at... Let's assume that the court found a take. What relief could it order? There's criminal and civil sanctions under Section 9 that would be available. And what I would assume would be the right thing to do, and this hasn't been briefed, but I would assume the district court would remand to the agencies, perhaps, to make a determination of penalties to impose or administrative enforcement, if appropriate, or just impose some kind of penalty under Section 9. Yeah, I'm just talking about under Section 9. Yeah, but nothing would happen under Section 7. With regard to the evidence on take, there is evidence that the grizzlies, that the hazing of the bison is taking place at the times that grizzlies are out And there's declarations showing that they're in the same general area. And there's evidence that there is certainly evidence, isn't there, that grizzly bears don't like helicopters are going to run away. And there's at least one in this picture which may or may not show a grizzly running away, but I'm not sure how important that is. So, I mean, how fine cut is your claim? You're saying that there's nothing in the record. that a grizzly bear which ran away from a helicopter and didn't eat as a result? I mean, what exactly are you saying should be there that isn't there? For a take claim, Alliance would have had to show evidence that a bear was harassed or harmed within the meaning of the ESA. And what that means is would have to show an instance where the bear was harassed or annoyed would likely be harmed because it was so significantly annoyed that its normal behavioral patterns would be significantly disrupted. That's what it would have had to show for the Section 9 take claim. There was other evidence about the studies. That would go to the Section 7 re-initiation of consultation claim. And that makes sense that maybe there would be some new studies showing that the use of helicopters really has a potential of negatively affecting grizzlies. So those studies go to the Section 7 claim. And what we argue on the Section 7 claim is that the agencies have actually looked at this, looked at the state's use of helicopters as a part of the cumulative effects and indirect effects of the federal component of the action for the IVMP. And really that 2012 biological evaluation is what should be challenged. It's judicially reviewable, and Alliance can bring a complaint challenging it at that. Okay. Thank you. Thank you, counsel. We'll give you a rebuttal. I had hoped to reserve. Your time's up. Okay. Just a few quick points. First, the government's representation that the Alliance needs to prove a proven past incident of harm is false under the Endangered Species Act. Under Section 9, you don't have to prove there was a taking in the past. You just need to show that there's a likelihood of one in the future. Forest Conservation Council versus Rosborough made that clear, that the purpose of Section 9 is to prevent imminent harm. So you certainly don't have to show a past incident. And since take is prohibited, even one incident of take, of course, you would not need to show a past harm to prevent a future take. Regarding the statements about there being a chilling effect when the six-day notice was filed, that is completely undermined by the fact that we did engage in settlement negotiations in the district court regarding the ESA issues. So there's certainly they were not chilled away from engaging in settlement talks. What's the likelihood language that you're talking about? Where is the likelihood language? 50 CFR 17.3. So you're saying it's not in the statute, it's in the regulation? Yeah. And then it's the definition of harass, but it is important to look back at the statutory definition of take and the way the courts have interpreted that. This court in Rosborough said it is to be construed in the broadest possible manner. And so that broad construction with this. I thought you just said before that the statute prohibits a likelihood of a take, but now you're saying something else. You're saying that the take definition itself includes likelihood. The take definition includes the term harass, and then the definition of harass is likelihood, a likelihood of injury by a disruption. And just to clarify the difference between impair and disrupt, that can be found at 46 Federal Register 54750 in the redefinition, the Fish and Wildlife Service's Rule Redefining Harm. This is why I'm backing up. You said that you don't have to show an actual take, you only have to show a likelihood of it. But now my understanding is you're saying that you do have to show an actual take, but an actual take can be shown by a likelihood of, right? Yes, Your Honor. Yes. I'm sorry if I wasn't clear. You don't have to show an actual injury or an actual death to prove a take. And just to clarify, the Park Service has exclusive jurisdiction over management of wildlife within the National Park, and so certainly the Park Service controls whether hazing of bison gets to happen because they have exclusive jurisdiction over bison within Yellowstone National Park. The representation that the agencies had no opportunity to respond to the video is also false. That video was given directly to the United States Forest Service, which in turn issued a public closure of that entire area because of grizzly bear presence to the public. Again, the Serene Letter at SCR 627 does not include the definition of harass as represented. I just read it again, and nowhere did I see the word disrupt, which is the definition of harass. Also, I think there is a statement about that a bear needed to die. That's certainly not required to show harassment. And just really quickly, an incidental take statement is in ESA Section 7. It's 16 U.S.C. 1536b4, so that is part of Section 7 consultation. And finally, just to reiterate, that the priority in this case has to be the grizzly bear and not cattle grazing on national forests because under the ESA, the grizzly bear takes the management priority over all other management priorities. The court has to act with institutionalized caution, and we have to give the benefit of the doubt to protecting the grizzly bear. One last thing. What about the argument that the federal government has essentially nothing to do with these helicopters? Well, Erin, I think that's clearly incorrect. The federal government completely funded this activity from its own- Oh, but it doesn't now. Well, it isn't because of this lawsuit temporarily, but certainly the state is- Because they don't intend to. The state is seeking federal funding still and probably that will recommence again. Even if there was no federal funding, which there is, this is an interagency management plan. The federal agencies created the EIS. They did the ESA consultation. They've done that now twice. Federal pilots sometimes- Expanding on to that, they say, well, we may have something to do with other pieces of it, but not the helicopters. Well, they chose to analyze this plan as one plan among many agencies with overlapping jurisdictions, and hazing really is one of the predominant activities that happens under this plan, and the state agency itself testified under it. I mean, a lot of it's on ground. Some of it's on the helicopter. Yes, but hazing in general. And they chose to analyze hazing in this EIS, and the state itself testified under oath before the district court that this management plan is the formal authorization document for helicopter hazing activities, not to mention the fact that sometimes there's a federal USDA employee who actually flies the helicopter. Thank you, counsel. We appreciate your arguments. Interesting case matters submitted. That ends our session for today and for the week.
judges: Schroeder, Paez, Berzon